# EXHIBIT B

Case No. 1:18-cv-00170-PAB Document 19-3 filed 03/28/18 USDC Colorado pg 2 of 3



REPUBLIC OF THE PHILIPPINES
REGIONAL TRIAL COURT
FOURTH JUDICIAL REGION
**BRANCH I**
**BUWAGAN NG KATARUNGAN**
**PALLOCAN WEST**
**BATANGAS CITY**

IN THE MATTER OF THE PETITION FOR SUSPENSION OF PARENTAL AUTHORITY OF AYATUNGA TODRUUL OVER MINOR TERGELSAR CHARLES EDWARD KRASNY ERGEN CHARGES EDWARDS, ON BEHALF OF TERGELSAR CHARLES EDWARD KRASNY ERGEN,
Petitioner,
SP. PROC. NO. 14-9796
-for-
Suspension of Parental Authority

AYATUNGAA TODRUUL,
Respondent.
x - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

The Ex-Parte Motion for Leave to Serve Summons by Publication filed by the petitioner through counsel is granted.

WHEREFORE, the petitioner is allowed to publish a copy of this Order, summons together with the copy of the petition, once a week for two(2) consecutive weeks, in the newspaper of genera circulation in the Philippines, and in the Province of Batangas. The latter to be chosen by raffle to be conducted by the RTC, OCC, Batangas City

Let copy of this Order be sent to the Office of the Solicitor General.

SOOREDERED.

GIVEN in open Court, this 5th dy of November, 2014 at Batangas City.

**(Sgd.) FLORENCIO S. ARELLANO**
Presiding Judge

I hereby certify that copy of this Order has been sent by registerd mail to the petitioner; respondent; Atty. Paolo Francisco Camacho and by personal delivery to the Office of the Provincial Prosecutor.

**(Sgd.) ATTY. GLENDA M. LACSAMANA-KING**
Branch Clerk of Court

---

REPUBLIC OF THE PHILIPPINES
REGIONAL TRIAL COURT
FOURTH JUDICIAL REGION
**BRANCH I**
**BUWAGAN NG KATARUNGAN**
**PALLOCAN WEST**
**BATANGAS CITY**

CHARGES EDWARDS,
Petitioner,
SP. PROC. NO. 14-9796
-for-
IN THE MATTER OF THE PETITION FOR SUSPENSION OF PARENTAL AUTHORITY OF AYATUNGA TODRUUL OVER MINOR TERGELSAR CHARLES EDWARDS KRASNY ERGEN CHARGES EDWARDS, ON BEHALF OF TERGELSAR CHARLES EDWARDS KRASNY ERGEN,

AYATUNGAA TODRUUL,
Respondent.
x - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SUMMONS**

TO: AYATUNGAA TODRUUL,
THROUGH
THE HONORABLE CONSUL OF MONGOLIA TO THE PHILIPPINES
2nd Floor Alencor Bldg.
No. 41 Linaw Street
Sta. Mesa Heights, Quezon City

GREETINGS:

You are herteby required to file with the Clerk of Court of the Regional Trial Court, Batangas City, Branch I, within fifteen (15) days after the service of this summons upon you, exclusive of the day of such service, your Answer to the Complaint/ Petition filed by the plaintiff/petitioner, a copy of which together with annexes is hereto attached and herewith served upon you, and to serve a copy of said answer within the same period upon the plaintiff/petitioner.

WITNESS, the HON. FLORENCIO S. ARELLANO, Presiding Judge of this Court, this 3rd day of December, 2014.

**(Sgd.) ATTY. GLENDA M. LACSAMANA-KING**
Branch Clerk of Court

Respectfully referred to Fernando A. Magcasi, Sheriff IV, requesting immediate service and return of the original with your indorsement thereon.

REPUBLIC OF THE PHILIPPINES
REGIONAL TRIAL COURT
FOURTH JUDICIAL REGION
BRANCH I
BUWAGAN NG KATARUNGAN
PALLOCAN WEST
BATANGAS CITY

IN THE MATTER OF THE PETITION FOR SUSPENSION OF PARENTAL AUTHORITY OF AYATUNGA TODRUUL OVER MINOR TERGELSAR CHARLES EDWARD KRASNY ERGEN CHARGES EDWARDS, ON BEHALF OF TERGELSAR CHARLES EDWARD KRASNY ERGEN,
Petitioner,
SP. PROC. NO. 14-9796
-for-
Suspension of Parental Authority

AYATUNGAA TODRUUL,
Respondent.
x - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PETITION**
**FOR SUSPENSION OF PARENTAL AUTHORITY**

Petitioner, CHARLES EDWARDS, ("Petitioner"), on behalf of the minor TERGELSAR CHARLES EDWARD KRASNY ERGEN ("Tergelsar"), by counsel, respectfully files this Petition for Suspension of Parental Authority, and states:

**I. NATURE OF THE PETITION**

1. This is a Petition for Suspension of Parental Authority under Article 231 of Executive Order No. 209, as amended, otherwise known as the Family Code of the Philippines ("Family Code").

**II. PARTIES**

2. Petitioner CHARLES EDWARDS is a citizen of Saint Christopher and Nevis, of legal age, single and is currently a resident of Pontefino Hotel and Residences, Pastor Village, Gulod Labac, Batangas City. Petitioner is the biological father of Tergelsar, on whose behalf Petitioner is filing this case. Sometime in April 2012, Petitioner changed his name from Charles Edward Krasny Ergen to his present name, Charles Edwards. For this case, Petitioner may be served with pleadings, orders, and other processes of this Honorable Court through the undersigned counsel, Angara Abello Concepcion Regala & Cruz Law Offices, at 22nd Floor, ACCRALAW Tower, Second Avenue corner 30th Street, Crescent Park West, Bonifacio Global City, 0399 Taguig, Metro Manila.

3. TERGELSAR CHARLES EDWARD KRASNY ERGEN is a two year-old baby girl who is a citizen of Saint Christopher and Nevis. Tergelsar is the common child of Petitioner and Respondent Ayatungaa Todruul ("Respondent"). Tergelsar is currently in the custody of Petitioner, and is also currently a resident of Pontefino Hotel and Residences, Pastor Village, Gulod Labac, Batangas City.

4. Respondent AYATUNGAA TODRUUL is a citizen of Mongolian People's Republic, of legal age, single, and whose current residence is unknown. Respondent is the biological mother of Tergelsar. Respondent may be served with pleadings, orders, and other processes of this Honorable Court through the Honorary Consul of Mongolia to the Philippines, at 2nd Floor Alencor Bldg., No. 41 Linaw Street Sta. Mesa Heights, Quezon City.

**III. STATEMENT OF FACTS**

5. On 1 September 2012, Petitioner arrived in the Philippines with plans of investing in the economy and contributing to the development of the country. In consort with this goal, Petitioner applied for a Special Investor Resident Visa ("SIRV") with the Bureau of Immigration, after being qualified as an investor by the National Board of Investments.

6. Sometime in the same month, Petitioner invited the Respondent to come to Manila and bring with the latter their infant daughter Tergelsar. At that time, Respondent had custody of Tergelsar and both were living abroad.

7. On 19 September 2012, Respondent, along with Tergelsar, and Respondent's mother, Solongo Bukhchuluun ("Solongo"), arrived in Manila. The three of them first stayed at The Exchange Regency Hotel in Pasig City. Petitioner hired a professional nanny to assist Respondent in taking care of Tergelsar.

8. During their first few days in Manila, as Petitioner, Respondent and Tergelsar began to settle in, Petitioner observed that Respondent and Solongo's belongings consisted primarily of paraphernalia used in, what appeared to be, satanic-shamanistic rituals, including but not limited to, demonic cult ritual garb, skulls, dried snakes, other dead and partially-decayed animals, animal and human body parts and bones, grave dirt, candles, whips, ritual daggers, restraining ropes, and pipes for smoking hallucinogenic substances.

9. Upon seeing these paraphernalia, and through the representation of Respondent and Solongo, Petitioner realized that Solongo is a voodoo practitioner, and Respondent is a witchcraft apprentice. Petitioner, while visiting Respondent's hotel room, observed that Respondent and Solongo would engage in daily voodoo-esque rituals and practices. These acts included satanic worshipping ceremonies, incense burning in the shape of human figurines, consistent intake of alcohol, smoking of unknown substances to facilitate going into a trance, masked dancing, drum beating, dressing and eating snake skins, speaking to animals, filling precious metal cups with blood and vodka, lighting the same on fire and taking turns ingesting the same. Petitioner likewise observed that these rituals centered around Tergelsar.

10. Later during their stay in Manila, Petitioner noticed that Tergelsar had bruises on some parts of her body. Petitioner likewise learned from the nanny that he hired, that amidst these rituals, Respondent and Solongo would involve Tergelsar by feeding the latter with vodka and other alcoholic drinks, flogging her and dripping candle wax on her.

11. Upon learning of the apparent harm inflicted by Respondent and Solongo on Tergelsar, Petitioner pleaded with the two to stop their rituals and practices, at the very least, on Tergelsar.

12. Petitioner became very concerned about these practices and, having initially thought the events described to be a result of a cultural misunderstanding, he proceeded to acquire the services of a full-time translator from Mongolia and invited everyone to the Shangri-La Resort in Boracay Island, Malay, Aklan, to discuss the aforementioned rituals and to understand the Respondent's perspective. Petitioner likewise attempted to make steps in order to protect what appeared to him as child abuse. Unfortunately, while Petitioner was partially successful in understanding the ideas behind the ritual, he failed to put an end to the acts of abuse being done by Respondent and Solongo on Tergelsar, which exponentially escalated as the days passed.

13. Eventually, due to the continued ceremonies and complaints from the other guests of the Shangri-La Resort that Respondent and Solongo refused to clothe themselves, Petitioner, along with the people he invited, were asked to leave the resort.

14. Due to the worsening events, Petitioner made one last effort to try to resolve the issue. Petitioner chartered a plane to Amanpulo resort in Palawan, which offered a more secluded setting where special arrangements to accommodate the ritualistic practices were made, with the condition that Tergelsar be supervised by a full time professional nanny and special attention be given to monitor the child's well-being.

15. Unfortunately even with this level of service, Respondent and Solongo were successful in several other ways to abuse the child including refusing to put sunscreen on Tergelsar while keeping her naked on the beach for hours, which resulted in an extremely severe sunburn and a heat stroke. There was even an instance when Tergelsar was force-fed bird droppings.

16. After returning from Amanpulo, Petitioner, along with Respondent, Tergelsar and Solongo, decided to stay at the Exchange Regency Hotel in Pasig City. There, the abuse kept intensifying. Apart from the already familiar practices of feeding the then five month-old Tergelsar raw meat and alcohol, Respondent and Solongo likewise refused to take the child to the hospital to treat the resulting diarrhea, vomiting, and fever. In addition to the foregoing, other abusive practices were introduced. These included but were not limited to binding Tergelsar with ritual restraint ropes, which preventing normal blood circulation to a degree where Tergelsar's extremities would turn blue, and gagging the child with a ritual cloth containing hallucinogenic plants and grave dirt. Half-decomposed animals and decaying animal and human body parts were likewise placed on top of Tergelsar while Respondent and Solongo conducted their satanic rituals. The two likewise pulled Tergelsar's tongue out of her mouth with tongs, and ritual incisions were made on her, in order to extract blood. Such extracted blood was offered to skulls placed on Solongo's voodoo altar by means of wetting the idol's lips with the Tergelar's blood.

17. Petitioner observed that there are other times when blood would be extracted from Tergelsar by pricking her palms and feet. On other occasions blood would be collected for the rituals from wounds on Tergelsar's lips and mouth resulting from the ritual whipping of the child's face.

18. Petitioner repeatedly tried to interfere and protect Tergelsar on multiple occasions, however Respondent and Solongo threatened that they would rather kill the child with their ritual daggers than let her live under the influence of forces alien to their accepted hierarchy of demons. This is an allusion to the fact that Petitioner was raised as a practicing Christian.

19. Sometime towards the end of October 2012, Petitioner, Respondent, Tergelsar and Solongo moved into Unit 17B, North Tower, Pacific Towers Condominium in Taguig City. Petitioner hoped that providing such a high standard of living and engaging Respondent and Solongo in various healthy activities such as physical exercise, yoga, swimming, and diving, would distract them from their barbaric practices. Unfortunately, upon their settling at the Taguig condominium, the ongoing child abuse quickly escalated to a very dangerous degree. New rituals involving strangulation with ceremonial skull beads resulted in the near asphyxiation of Tergelsar. Respondent and Solongo, began poking into the Tergelsar's mouth cavity with ritual daggers resulting in profuse bleeding and untold suffering of the child. For the entire duration of the ceremonies, Respondent kept pouring vodka and other alcoholic drinks into the Tergelsar's mouth while Solongo was chanting incantations.

20. For the entire duration of the Tergelsar's stay in the Philippines, Respondent and Solongo refused Tergelsar basic medical care, and denied the necessary hospital visits and vaccinations. Rather than refer Tergelsar to qualified medical specialists, which Petitioner insisted on and was more than willing to provide, Respondent and Solongo would instead perform their sadistic "healing" rituals on her.

21. Due to his ever growing concern for the safety and well-being of Tergelsar, Petitioner talked to Respondent on the possibility of turning over to him the custody and care of Tergelsar. Petitioner requested for the full custody and care over Tergelsar as Respondent had no legitimate source of income

in Mongolia or anywhere else, which would enable her to raise the child. Respondent likewise did not want to reside in the Philippines for the long term. After several discussions with Petitioner, Respondent agreed to waive custody rights over the infant Tergelsar.

22. On the 5 November 2012, in hopes of providing Tergelsar some rest from the continuous abuse, Petitioner brought Respondent and Tergelsar to Arthur's Place, Anilao, Mabini, Batangas for a vacation. There at a local resort, Respondent again subjected Tergelsar to vodka ingestion. Tergelsar started crying hysterically as apparently, she could no longer take any more alcohol, and because of this Petitioner finally decided to intervene and took the vodka away from Respondent.

23. Respondent resented Petitioner's act of stopping what she was doing. Respondent became enraged, shouted that Tergelsar must die, and then violently threw Tergelsar to the ground. Tergelsar then lost consciousness for several minutes, had convulsions and seizures, vomited and defecated. Fearing for the Tergelsar's life, Petitioner immediately picked up the baby from the ground and rushed Tergelsar back to Manila. Upon arriving in Manila more than two and a half hours later, Petitioner brought the baby to Cardinal Santos Medical Center in San Juan City, where at the said hospital, Tergelsar was found to have had alcohol poisoning and severe concussion.

24. Due to these events, Petitioner filed criminal cases against Respondent and Solongo in the Office of the City Prosecutors of Pasig, Taguig and the Office of the Provincial Prosecutor of Batangas. Supported by Petitioner's own complaint-affidavit , as well as the affidavits of witnesses who personally witnessed abusive conduct committed by the Respondent on Tergelsar, the criminal complaints prospered. All three criminal complaints were found to be credible and with proper basis. In each of the said complaints, probable cause to file a criminal case was found.

25. The Office of the City Prosecutor of Taguig, in a Resolution dated 14 January 2014, found probable cause to charge the Respondent with a violation of Section 10(a) of Republic Act No. No. 7610, otherwise known as the Special Protection of Children Against Abuse, Exploitation and Discrimination Act (R.A. No. 7610) due to cruelty and psychological abuse:

"After evaluating the evidence on record, we find probable cause to charge respondents with Violation of Sec. 10(a) of R.A. 7610 committed by inflicting physical harm on the victim by strangulating the child, poking into the child's mouth cavity with a ritual dagger and pouring alcoholic drinks into the child's mouth constituting cruelty and psychological abuse."

26. The Office of the City Prosecutor of Pasig likewise found probable cause to charge Respondent and Solongo with violation of R.A. No. 7610.

27. More notably, the Office of the Provincial Prosecutor of Batangas, in a Resolution dated 21 December 2012, found probable cause to charge Respondent with Frustrated Parricide under Article 246 in relation to Article 6 of the Revised Penal Code due to the act of Respondent in throwing Tergelsar on the floor with intent to kill her:

"With respect to Ayatungaa's act of throwing on the ground her baby, who was merely five months old, out of anger and after shouting that the child must die, the undersigned finds that there was intent to kill on the part of Ayatungaa Todruul. And the fact that the child sustained cerebral concussion shows the gravity of respondent's acts and the seriousness of injury sustained by the baby. Thus, the undersigned finds that the crime of Frustrated Parricide is applicable in this case."

28. Informations in relation to the foregoing findings of probable cause against Respondent were accordingly filed before the appropriate courts and corresponding warrants of arrest were subsequently issued. The following criminal cases against the Respondent are now pending before the courts:

28.1. People of the Philippines v. Ayatungaa Todruul and Solongo Bukhchuluun, docketed as Criminal Case No. 150322, for Violation of R.A. No. 7610, pending before the Regional Trial Court of Taguig City, Branch 163;

28.2. People of the Philippines v. Ayatungaa Todruul and Solongo Bukhchuluun, docketed as Criminal Case No. 150026, for Violation of R.A. No. 7610, pending before the Regional Trial Court of Pasig City, Branch 159; and

28.3. People of the Philippines v. Ayatungaa Khiad Todruul, docketed as Criminal Case No. 17882, for Frustrated Parricide under Article _ of the Revised Penal Code, pending before the Regional Trial Court of Batangas City, Branch 1.

29. Considering that all three (3) trial courts issued warrants of arrest against her, the Respondent, along with Solongo, fled the country and supposedly returned to Mongolia. In order to effect their arrest, and owing to the seriousness of the offenses committed by the Respondent, the Interpol, through the recommendation of the Philippine Center for Transnational Crimes, issued a Red Notice against the Respondent in order to seek her location and effect her detention, arrest or restriction of movement for the purpose of extradition, surrender, or similar lawful action.

30. After filing the foregoing criminal cases, Petitioner, the only remaining parent and guardian of Tergelsar, brought the latter out of the country in order to seek proper medical treatment for her. Since the flight of the Respondent out of the country, Petitioner has exercised sole and actual parental authority and custody over Tergelsar, raising her in the safety and protection of his constant supervision, affection and care.

31. Petitioner has now returned to the country, and brought Tergelsar along with him, in order to raise her here in the Philippines, as he continues his plan of investing in Philippine economy.

**IV. ARGUMENTS IN SUPPORT OF THE PETITION**

32. From the clear and undeniable acts of abuse, cruelty and excessive harshness inflicted upon Tergelsar by the Respondent, which acts have become the basis for charging her with serious violations of R.A. No. 7610 and Frustrated Parricide under the Revised Penal Code, the parental authority of the Respondent over Tergelsar must be suspended, if not altogether revoked, pursuant to Article 231 of the Family Code, which reads:

Article 231. The court in an action filed for the purpose or in a related case may also suspend parental authority if the parent or the person exercising the same:

(1) Treats the child with excessive harshness or cruelty;
(2) Gives the child corrupting orders, counsel or example;
(3) Compels the child to beg; or
(4) Subjects the child or allows him to be subjected to acts of lasciviousness.

The grounds enumerated above are deemed to include cases which have resulted from culpable negligence of the parent or the person exercising parental authority.

If the degree of seriousness so warrants, or the welfare of the child so demands, the court shall deprive the guilty party of parental authority or adopt such other measures as may be proper under the circumstances.

The suspension or deprivation may be revoked and the parental authority revived in a case filed for the purpose or in the same proceeding if the court finds that the cause therefor has ceased and will not be repeated. (332a)

33. As narrated above, Respondent committed acts against Tergelsar that could easily be categorized as excessive harshness or cruelty. At her tender age, Tergelsar was exposed to serious and bizarre forms of physical abuse in the form of forced ingestion of alcohol, wounds caused by knife stabs and cuts, flogging, asphyxiation, and forced feeding of bird droppings. On account of these reprehensible acts, Respondent was charged with several counts of Violation of R.A. No. 7610 or Child Abuse by both the Office of the City Prosecutor of Taguig and Pasig.

34. Throughout all the abusive conduct of Respondent, Tergelsar was denied medical treatment by Respondent despite repeated pleas from the Petitioner to bring Tergelsar to a hospital, which in itself constitutes a clear form of abuse under R.A. No. 7610, to wit:

Section 3. Definition of Terms. –

x x x

(b) "Child abuse" refers to the maltreatment, whether habitual or not, of the child which includes any of the following:

x x x

(4) Failure to immediately give medical treatment to an injured child resulting in serious impairment of his growth and development or in his permanent incapacity or death.

35. The acts committed by Respondent against the infant Tergelsar culminated in the act of violently throwing Tergelsar on the ground while shouting that "Tergelsar must die." The convulsions and seizures, as well as the severe concussion suffered by Tergelsar resulting from her being thrown on the floor is clear evidence of the excessive harshness and cruelty inflicted by the Respondent upon her own daughter. The abusive and cruel conduct of the Respondent over Tergelsar was confirmed by the Office of the Provincial Prosecutor of Batangas found which found probable cause to charge Respondent with Frustrated Parricide.

36. Frustrated Parricide under the Revised Penal Code, is merely one step lower than actual Parricide – the capital offense of killing a father, mother, or child, whether legitimate or illegitimate, or any of his ascendants, or descendants, or spouse, and punishable by the penalty of reclusion perpetua to death. By being charged with Parricide in its "frustrated" stage, the Respondent "[performed] all the acts of execution which would produce the felony as a consequence but which, nevertheless, do not produce it by reason of causes independent of the will of the perpetrator." In other words, had it not been for the swift and effective intervention of the Petitioner in saving the life of Tergelsar by rushing her to a medical facility, Respondent would have killed Tergelsaras, as she, with criminal intent, performed all the acts necessary to commit the crime of Parricide. On this very score alone, Respondent should be stripped of parental authority over Tergelsar.

37. The existence and continued pendency of the criminal cases against the Respondent before three (3) different Courts, the outstanding warrants of arrest issued against her, and the Interpol Red Notice for her arrest, speak volumes on the propriety of suspending Respondent's parental authority over Tergelsar pursuant to Article 231 of the Family Code.

38. The serious abuse and excessive harshness and cruelty inflicted by the Respondent upon Tergelsar cannot be justified on the ground of tradition or of cultural ritualistic ceremonies of Mongolia, for the following reasons:

38.1. First, it is the declared policy of the State "to provide special protection to children from all forms of abuse, neglect, cruelty exploitation and discrimination and other conditions, prejudicial their development." R.A. No. 7610 does not provide for any exception to the proscription against child abuse on traditional or cultural grounds.

38.2. Second, the protection of children from abuse is an international policy that is highlighted and embodied in the United Nations Convention on the Rights of the Child, a treaty signed, ratified and accepted by more than one hundred countries – including Mongolia and the Philippines. According to this treaty, "States Parties shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child."

38.3. Third, Respondent was charged with Frustrated Parricide for an act that was not, in any way whatsoever, connected with or arising from Respondent's cultural and traditional background --- i.e., throwing Tergelsar on the floor with intent to kill her. Hence, Respondent cannot hide under the notion that the acts done on Tergelsar is part of the cultural or traditional practices of Respondent to justify the same.

39. The fact that Tergelsar is only two (2) years old does not preclude the suspension of Respondent's parental authority. According to the Supreme Court in Perez v. Court of Appeals :

"The general rule that a child under seven years of age shall not be separated from his mother finds its raison d'etre in the basic need of a child for his mother's loving care. Only the most compelling of reasons shall justify the court's awarding the custody of such a child to someone other than his mother, such as her unfitness to exercise sole parental authority. In the past the following grounds have been considered ample justification to deprive a mother of custody and parental authority: neglect, abandonment, unemployment and immorality, habitual drunkenness, drug addiction, maltreatment of the child, insanity and being sick with a communicable disease."

40. Under the aforequoted jurisprudence, maltreatment of a child is cause for a parent to lose parental authority even if the child is less than seven (7) years old. Calling what the Respondent did to Tergelsar as "maltreatment of a child" is understating what Tergelsar went through in the hands of Respondent. There is therefore much more compelling reason why this Honorable Court should suspend the parental authority of Respondent.

41. Furthermore, Respondent's flight to Mongolia is a strong indication of her guilt of the crimes charged against her. Indeed, it is "well-established that the flight of an accused is competent evidence to indicate [her] guilt; and flight, when unexplained, is a circumstance from which an inference of guilt may be drawn." Thus, there is more than sufficient basis, in fact and in law, to suspend, if not altogether remove, the parental authority of Respondent over Tergelsar.

42. To date, Respondent has been absent from the Philippines, and in all likelihood, will not be returning in the country due to the outstanding warrants of arrest and the criminal cases that she will be facing should she choose to enter this jurisdiction. Since the Respondent's flight to Mongolia, Petitioner has provided, and continues to safeguard, Tergelsar's well-being, security and overall development.Accordingly, Petitioner, who is gainfully employed, is the only remaining parent and guardian of Tergelsar present in the country whocan and will guarantee that her best interests are protected.

43. In this regard, due to violent acts committed by Respondent against Tergelsar, Respondent's parental authority over Tergelsar must be suspended. Likewise, by automatic operation of law and since this Honorable Court must recognize that Tergelsar is most safe and most cared for in the custody of the Petitioner, Petitioner must be granted custody of Tergelsar.

44. Moreover, granting custody over Tergelsar in favor of the Petitioner will operate to serve her best interests. Petitioner intends to raise Tergelsar in the Philippines and will, thus, require an official pronouncement over his parental authority and custodial rights over Tergelsar to efficiently and expediently discharge his duties as parent, including, but not limited to, securing Tergelsar's health insurance and enrolling her in educational institutions.

45. As a final note, it must be recalled that is a declared policy under Republic Act No. 7610, otherwise known as the "Special Protection of Children Against Abuse, Exploitation and Discrimination Act," that the "State shall intervene on behalf of the child when the parent, guardian, teacher or person having care or custody of the child fails or is unable to protect the child against abuse, exploitation and discrimination or when such acts against the child are committed by the said parent, guardian, teacher or person having care and custody of the same." Petitioner believes that this Honorable Court can and should uphold such policy.

**PRAYER**

WHEREFORE, Petitioner Charles Edwards respectfully prays that case this Honorable Court:

1) SUSPEND the PARENTAL AUTHORITY of Respondent Ayatungaa Todruul over the minor Tergelsar Charles Edward Krasny Ergen; and

2) GRANT Petitioner Charles Edwards PERMANENT CUSTODY over his minor daughter Tergelsar Charles Edward Krasny Ergen.

Petitioner likewise prays for other just and equitable reliefs.

Taguig City for Batangas City, 23 September 2014.

**ANGARA ABELLO CONCEPCION REGALA & CRUZ**
Counsel for Petitioner
22nd Floor, ACCRALAW Tower
Second Avenue corner 30th Street
Crescent Park West, Bonifacio Global City
0399 Taguig, Metro Manila
Telephone No. (632) 830-8000
Facsimile Nos. (632) 403-7007 and (632) 403-7009
By:

**(Sgd.) ARNOLD M. CORPORAL**
PTR No. A-1971551; 01/06/14; Taguig City
IBP No. 951770; 01/06/14; Makati City
Roll No. 43033
MCLE Compliance No. IV-0012402; 02/12/2013

**(Sgd.) CARLO ENRICO C. ALOJADO**
PTR No. A-1971587; 01/06/14; Taguig City
IBP No. 951953; 01/06/14; Quezon City
Roll No. 62389
MCLE Compliance No. N/A

>>>EDWARDS vs. TODRUUL.....turn to P/8